Argued and submitted November 26, 1986, resubmitted In Banc September 9, affirmed December 9, 1987, reconsideration denied January 8, petition for review denied February 2, 1988 (305 Or 45)

## STATE OF OREGON,
*Respondent,*

*v.*

## KYM LIZABETH BOWEN,
aka Kym Lizabeth Wells,
*Apellant.*

(10-85-06771; CA A39915)

746 P2d 249

John P. Daugirda, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Jens Schmidt, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave

Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

ROSSMAN, J.

Joseph, C. J., specially concurring.

Buttler, J., dissenting.

## ROSSMAN, J.

This criminal case involves the legality of a frisk by police officers who became concerned about their safety as events unfolded during a routine traffic stop. Defendant appeals her conviction for unlawful possession of a controlled substance, ORS 475.992(4)(b), assigning error to the trial court's denial of her motion to suppress evidence obtained as a result of a frisk for weapons. We affirm.

On May 20, 1985, at 2:35 a.m., Officer Wight saw a car being driven with its headlights off. He testified that he stopped the car because the headlights were not on and because it was in a high crime area. Defendant and two men were occupants of the car. Wight asked the driver for his identification, and he identified himself as "Bill Harrison." He told Wight that the car belonged to his "old lady" but that it was registered to a woman named "Carla." The driver was not carrying a driver's license. He was unable to provide his full address and gave a birth date that was inconsistent with his stated age. Wight conducted an MVD records check and was told that there was no one with the driver's claimed name and date of birth holding a valid Oregon driver's license.

During Wight's questioning, Officer Shelby arrived. Wight and Shelby questioned the male passenger, who identified himself as "Jim Brumwell." Shelby knew Brumwell and knew that the passenger was not Brumwell. The passenger's real name was Holdrich. Holdrich and defendant identified the driver as "Mitch" and said they did not know his last name. Wight then arrested the driver for failure to display a driver's license, handcuffed him and turned him over to Shelby to be searched. About that time, Officer Smith arrived and assisted Shelby in that search, during which Shelby found an unloaded gun.

Wight then asked defendant to step out of the car, where she had been sitting throughout the encounter. He told her to remove her coat, a heavy leather jacket. She did so and gave it to him. He then had her turn around so that he could be certain that she was not carrying a weapon on her person. He intended to pat down the coat and then return it to her, because the weather was cold. When he patted it down, he felt several hard objects in an inside pocket, at least two of which were large enough to be weapons. Wight thought that one of

them might have been a knife. He reached inside the pocket and removed a syringe, with plastic covering the tip, a translucent plastic box and a compact.[1] Defendant refused to answer when Wight asked her what was in the box. She was not arrested at that time and was allowed to leave the scene with her jacket, but without the items seized from her pockets. A few days later a warrant was obtained to test the contents of the box; the test showed that it contained methamphetamine.[2]

When asked precisely why he frisked defendant at the time, Wight testified:

"I had a vehicle that had been operating in a suspicious manner, and I had a vehicle that did not belong to anybody that was in the car.

"I had two out of three people so far that had identified themselves to me falsely, and the owner of the car wasn't there, and I didn't know if it was stolen or not.

"And I had the driver of the car armed with a firearm."

Wight also testified that defendant had been seated "right next to" and "probably touching" the driver. The officer stated that he was concerned for his safety.

Shelby, who found the gun, testified:

"[F]or safety reasons, it would be foolish to assume if one person has a weapon that other people there don't have weapons.

"For my safety, I would assume if there's one weapon on one person there could be weapons on other people also."

Smith, who reported to Wight that the driver of the car was armed, testified:

"I immediately walked forward rapidly in a trot actually

---

[1] Defendant contends that the search of her coat pocket was overly intrusive. The dissent is apparently suggesting that the officer was required to inventory the contents of defendant's pocket before removing any objects. However, on these facts, the officer had ample cause to reach into the pocket and to remove the hard objects to look at them.

[2] Defendant does not raise any issue regarding the legality of the seizure and, therefore, does not assert that the plastic box should have been returned to her. However, she does argue that the execution of the warrant for testing of the box's contents was not done within the five-day period required by statute. ORS 133.565(3); ORS 133.575(1). The trial court found, with ample support in the record, that the testing was done within five days, and defendant's argument is therefore without merit. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

toward Lt. Wight, and I yelled at him that the driver had a gun. * * * I was concerned that there would be other weapons either on the people or in the vehicle, particularly due to the nature of the stop and the evasiveness of the people we had."

Defendant contends that the stop was not based on a reasonable suspicion that defendant had committed a crime and that the frisk was not based on a reasonable suspicion that defendant was armed and presently dangerous. The state contends that the detention of defendant was lawful, because she was a passenger in a lawfully stopped automobile, and that the frisk was lawful, because it was based on a reasonable suspicion that defendant was armed and presently dangerous.

ORS 131.615(1) provides:

"A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that the peace officer is a peace officer, make reasonable inquiry."

ORS 131.605(5) defines a "stop" as:

"[A] temporary restraint of a person's liberty by a peace officer lawfully present in any place."

ORS 131.625(1) provides:

"A peace officer may frisk a stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present."

■ The stop of the car was lawful as a stop for a traffic violation committed in the presence of an officer. *State v. Tucker,* 286 Or 485, 492, 595 P2d 1364 (1979). The parties dispute whether a statutory stop of defendant must necessarily precede a frisk under these circumstances.[3] We need not reach that question, because we hold that a valid statutory stop took place.[4]

---

[3] ORS 131.615 does not provide the exclusive basis for making lawful vehicle stops. *Nelson v. Lane County,* 304 Or 97, 108, 743 P2d 692 (1987); *State v. Tourtillott,* 289 Or 845, 853, 618 P2d 423 (1980) *cert den* 451 US 972.

[4] Although our prior cases are ambiguous on this point, it is clear that, at the very least, defendant was lawfully detained as a passenger in a vehicle lawfully stopped. *State v. Wise,* 54 Or App 700, 635 P2d 1374 (1981), *rev den* 292 Or 722 (1982); *State v. Zimmerlee,* 45 Or App 107, 112, 607 P2d 782, *rev den* 289 Or 71 (1980). In *Zimmerlee,* an officer stopped a car because it was being driven at night without lights. During the traffic stop, the police received a radio report of a robbery; the description of the robber and vehicle used matched those of the passenger and car, prompting his arrest.

■ Whatever the appropriate characterization of defendant's situation was earlier, defendant was clearly stopped when Wight asked her to step out of the car. Therefore, the ultimate question in resolving this case is whether that stop was lawful. The statute provides that the police may lawfully stop someone if there is a reasonable suspicion that the person has committed a crime. ORS 131.615(1). Carrying a concealed weapon is a crime. ORS 166.240; ORS 166.250. Here, Wight had a reasonable suspicion that defendant was committing the crime of carrying a concealed weapon. He had stopped a car that had been operated in a suspicious manner during the early morning hours in a high crime area. Two of the three occupants had given him false information, and he did not know whether the information given by the third, defendant, was accurate. Wight had not been able to determine the identity of the car's owner or whether the car had been stolen. He had just been informed that the driver, who was seated next to defendant, was armed. Those circumstances are specific and articulable facts which would lead a reasonable police officer to suspect defendant was armed, and they justified the stop of defendant.

An officer may frisk a stopped person for dangerous weapons if he "reasonably suspects that the person is armed and presently dangerous." ORS 131.625(1). The same facts in this case that justified Wight's reasonable suspicion that defendant was carrying a concealed weapon necessarily justified his reasonable suspicion that defendant was armed and dangerous. Those circumstances led him, as a prudent police officer, to have a reasonable and legitimate concern for his safety which he could alleviate with a simple pat down.[5]

---

He contended that the stop of the vehicle and operator was not a sufficient basis to stop and detain him. We held that it was.

"Although defendant's progress toward his destination may have been interrupted by the officer's actions, the stop and detention of him were merely as an incident to his being a passenger in a vehicle lawfully stopped." 45 Or App at 112.

In *Wise*, the defendant, a passenger in a vehicle, contended that the police had no basis for stopping him when they stopped the driver for driving without a license. We held that the stop of the defendant was valid: "Of course, defendant was in the vehicle, and when [officer] Carter stopped it, defendant was stopped 'as an incident to his being a passenger in a vehicle lawfully stopped.' " 54 Or App at 705.

[5] *State v. Baldwin,* 76 Or App 723, 712 P2d 120 (1985), *rev den* 301 Or 193 (1986), cited by defendant, is quite different from this case. The only "circumstances" that led to the frisk there were that the defendant was in an area where the officer knew that

In *State v. Weeks,* 29 Or App 351, 563 P2d 760 (1977), we faced a similar situation. A car that an officer stopped because of expired license plates was similar to one used in a recent robbery. The driver identified herself by a name different than one that she had given to another officer an hour before. She did not own the car and could not produce the car's registration. The car was seized for impoundment, and an inventory search resulted in the discovery of a gun under the seat. The officer immediately patted down the passenger, who had been previously told that he was free to leave, and discovered a holster. We held that discovery of the weapon and the appearance of the car were sufficient to give rise to a reasonable suspicion that the passenger was armed and dangerous. *See also State v. Miller,* 51 Or App 237, 242, 624 P2d 1102, *rev den* 291 Or 9 (1981).[6]

Police officers must be permitted to take appropriate measures to assure that they are not endangered by those with

---

many people were armed and that the defendant possessed less than an ounce of marijuana. We reversed the admission of the seized knife in evidence, because the officer could not articulate a reasonable suspicion that the defendant was actually armed and presently dangerous. 76 Or App at 727.

[6] The dissent cites the recent Supreme Court case *State v. Okeke,* 304 Or 367, 745 P2d 418 (1987), as support for its argument. However, that case is not relevant to this one. *Okeke* and the cases it relies on, *State v. Newman,* 292 Or 216, 637 P2d 143 (1981), *cert den* 457 US 1111 (1982) (search for identification), and *State v. Perry,* 298 Or 21, 688 P2d 827 (1984) (inventory search), deal with searches incident to detention under the non-criminal public intoxication statute, ORS 426.460. The court distinguished cases like the present one:

> "Today's decision also does not deal with evidence found in a search upon individualized probable cause. It deals with the prosecutorial use of evidence seized in a routinized, unconsented search of the belongings of a person who has been detained by public officers not on suspicion of criminal conduct but ostensibly for the person's own good. The legislature's purpose in ORS chapters 426 and 430 was to decriminalize intoxication and instead offer its victims protective facilities until its disabling effect has worn off." *State v. Okeke, supra,* 304 Or at 373.

Unlike *Okeke,* defendant was detained because of an individualized suspicion of criminal conduct. The dissent also contends that the facts here constitute only a "concern," not a reasonable suspicion. However, this "concern" fits clearly within the statutory definition of reasonable suspicion. ORS 131.605(4) defines "reasonably suspects" as holding "a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts as authorized * * *." In any event, the dissent does not state whether such a concern could be alleviated by a lawful frisk. If not, officers must choose between their safety and an illegal search. If the dissent means that a "concern" would justify a lawful frisk, but the state could not introduce into evidence weapons or contraband produced by the frisk, we have the bizarre result that lawfully obtained evidence of crime must nonetheless be suppressed.

whom they come into contact in the performance of their duties. The law does not, and should not, require them to be at the mercy of persons whom they stop and who are armed.

Affirmed.

**JOSEPH, C. J.,** specially concurring.

I have a concern that the majority opinion in this case could be the beginning point of a decisional trend to the effect that every time that a police officer believes that he has reason to fear for his own safety he may frisk *everyone* with respect to whom he has that fear *and* that the state may use as evidence anything that turns up in the course of the frisks. If that becomes an operating principle, it is very likely to overwhelm the preferable operating principle that official interference with individual freedom of movement is legally tolerable only in compelling circumstances.

Because the majority casts its decision in terms of preferences for police officers' concerns about their safety, I write to express my view of an appropriately narrow decision which I am willing to accept. Under ORS 131.615(1), a policeman can only stop a person if he "reasonably suspects that [the] person has committed a crime." Under ORS 131.605(5), a stop is only a "temporary restraint" and is limited for the purpose, as described in ORS 131.615(1), of making a "reasonable inquiry." If the person stopped is then arrested as a result of the reasonable inquiry, the analysis from that point on must be based on what is permitted after the arrest of that person. If the person is not arrested as a product of the reasonable inquiry, the policeman, under ORS 131.625(1), may "frisk [the] stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present."

In this case, defendant was stopped within the meaning of the quoted statutes when Wight ordered her to get out of the car. For that order and the stop to have been lawful, Wight had to have had a reasonable suspicion that defendant had committed a crime. Given that the other two occupants of the car had given false information, that Wright did not know who was the owner of the car, that he did know that it did not belong to any of the people in the car and that the driver had

been found to be armed, he had a basis for reasonable suspicion that defendant might illegally be carrying a weapon. Any suggestion that Wight's belief that defendant was "armed and presently dangerous" in and of itself warranted the stop simply cannot be true. The statute plainly and clearly identifies the conditions precedent for a stop and *then* a frisk.

The legislature has decided that police authority to stop, question and search individuals is limited. I cannot agree with any suggestion in the majority opinion that police have the power to make their own rules based on subjective apprehension of danger. *See Nelson v. Lane County*, 304 Or 97, 104-107, 743 P2d 692 (1987). A policeman's concern for his own safety is not the equivalent of reasonable suspicion.

Believing that defendant does not challenge anything beyond the validity of the frisk and removing the objects from her jacket, I concur in the majority's result.

Warden, Young and Newman, Judges, join in this specially concurring opinion.

**BUTTLER, J.,** dissenting.

Defendant, a passenger in the automobile, was not "stopped" within the meaning of ORS 131.605 when the officer stopped the driver of the automobile for driving at night without headlights on.[1] *See State v. Zimmerlee*, 45 Or App 107, 607 P2d 782, *rev den* 289 Or 71 (1980).

However, when Officer Wight asked defendant to step out of the car and remove her leather jacket, and then frisked her and patted down the jacket, she was stopped within the meaning of ORS 131.605. Assuming that the officers had a reasonable suspicion that defendant had committed a crime, ORS 131.615(1), there is no evidence that defendant was "armed and presently dangerous to the officer," a prerequisite to the statutory authority to frisk the stopped person. ORS 131.625(1). The most that can be concluded from the testimony is that Wight frisked defendant's

---

[1] The authority to stop the automobile for driving without headlights, ORS 811.521, is found in ORS 810.410(3)(b), which does not authorize a frisk of the person stopped for weapons. However, when the driver gave the officer a fictitious name, he committed a Class A misdemeanor, ORS 807.620, authorizing the officer to stop and detain him under ORS 131.615. During the latter stop, ORS 131.625 is applicable.

coat because the driver of the car was carrying an unloaded weapon and because he thought that the car might have been stolen. Wight's testimony that two out of the three people in the car had identified themselves falsely, although defendant had not done so, adds nothing to the suspicion that defendant was armed and dangerous. Defendant was cooperative and non-threatening. One of the other officers testified that it would have been foolish to assume that, if one person has a weapon, other people there do not have weapons; as he put it, "[T]here could be weapons on other people also." Officer Smith also testified that he was concerned that there might be weapons in the possession of other persons.

The officers' concern, however, does not rise to the level of a reasonable individualized suspicion that defendant had committed a crime or that she was armed and presently dangerous. *See State v. Baldwin,* 76 Or App 723, 712 P2d 120 (1985). This case may be one of those in which evidence is seized in a "routinized, unconsented search of the belongings of a person who has been detained by public officers not on suspicion of criminal conduct" for the protection of the person and others. *State v. Okeke,* 304 Or 367, 745 P2d 418 (1987). In such a case, the evidence may not be used to prosecute the person, without violating Article I, section 9, of the Oregon Constitution.

Even if the stop and frisk of defendant was lawful, the "pat down" of her jacket was more intrusive than is statutorily authorized to determine if the jacket contained a weapon. The authority of ORS 131.625 to frisk the stopped person for weapons is not authority for a general search of the person. The statute is clear, precise and limited:

> "If, in the course of the frisk, the peace officer *feels* an object which the peace officer reasonably suspects is a dangerous or deadly weapon, the peace officer may take such action as is reasonably necessary to take possession of *the weapon*." ORS 131.625(2). (Emphasis supplied.)

The only justification that the officer gave for emptying defendant's pockets was that *one* of the objects felt like it might be a knife.[2] Accepting that statement as true, the officer

---

[2] The majority points out that Wight felt at least two objects that were "large enough" to be weapons; he did not, however, say that he suspected both of being weapons.

would have been justified in removing that object, but not other objects that he had no reason to believe might be weapons, in the absence of evidence that it was reasonably necessary to do so in order to take possession of the suspected weapon. *State v. Gressel,* 276 Or 333, 554 P2d 1014 (1976).

The state's and the majority's reliance on *State v. Weeks,* 29 Or App 351, 563 P2d 760 (1977), is ill-founded. There, after the automobile in which the defendant was a passenger had been stopped, the officers learned that the automobile matched the description of one involved in a robbery the previous night. After the driver had been arrested and the owner of the automobile could not be ascertained, the officers impounded the automobile and inventoried its contents. During the *inventory,* they found a pistol under the passenger seat, at which point they had a reasonable suspicion that the passenger was armed and dangerous. In patting him down, they found a shoulder holster on his person. That is not this case.

I can find no basis for stopping defendant or for frisking her for weapons. Even if defendant was lawfully stopped and frisked, the officer exceeded the limited permissible "pat down" for weapons. The evidence may not be used to prosecute defendant. Accordingly, I dissent.