Argued and submitted May 19, 1989, affirmed February 7, reconsideration denied
March 28, petition for review denied June 5, 1990 (310 Or 122)

## STATE OF OREGON,
*Respondent,*

*v.*

## JESUS VALDEZ OLAIZ,
*Appellant.*

(88-01-30523; CA A49378)

786 P2d 734

Brian P. Conry, Portland, argued the cause and filed the brief for appellant.

Michael Livingston, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

Warren, J., dissenting.

## ROSSMAN, J.

Defendant appeals his conviction for delivery of a controlled substance, ORS 475.992, assigning as error the trial court's denial of his motion to suppress. He challenges the validity of the traffic stop that led to seizure of the evidence on the grounds that it was not authorized under ORS 810.410 and that it was a "pretext stop," in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment. We affirm.

We take the facts from the trial court's findings. *Ball v. Gladden,* 250 Or 485, 487-88, 443 P2d 621 (1968). While police narcotics officers Anderson and Gray were conducting surveillance of a Portland motel room associated with drug dealing, they saw defendant and a passenger drive up and look in its window. When the two men drove away, the officers followed them, hoping to be led to the dealers who had been selling narcotics out of the room.

Defendant was driving. He entered I-84, driving 10 to 15 miles over the speed limit much of the time. Leaving the freeway, he proceeded to a Gresham apartment, where he and his passenger spent about ten minutes, then came outside and drove away. Still following, the officers asked Multnomah County Sheriff's Department uniformed officers to stop defendant for speeding so that they could identify him and his passenger and gather information.

Before the uniformed officers could make the stop, defendant and his passenger drove about two more miles to an apartment complex, parked and began to get out of their car. Stopping about ten feet behind them, Anderson and Gray also got out of their car, displaying their badges. Approaching defendant, Anderson identified himself as a police officer and said, "Hold on, we'd like to talk to you for a second." Anderson testified that he asked defendant for his driver's license and "told him he was going a little fast." Defendant stated that he had no license and presented several traffic tickets to Anderson. At that point, Gray informed Anderson that defendant's passenger was smoking marijuana.

Anderson asked defendant if he had any marijuana. Defendant replied that he had none and offered to let Anderson search the car. Anderson told Gray that they had permission to search the car and then conducted a pat down search of

defendant for weapons, during which defendant reached into his pocket and handed him a baggie of marijuana. A search of the car produced approximately 2-1/2 grams of tar heroin, and Anderson arrested defendant for drug crimes.

■ Defendant first argues that the stop was not authorized by ORS 810.410, which provides, in pertinent part:

"(1) A police officer may arrest or issue a citation to a person for a traffic crime at any place within or outside the jurisdictional authority of the governmental unit by which the police officer is authorized to act as provided by ORS 133.235 and 133.310.

"(2) A police officer may issue a citation to a person for a traffic infraction at any place within or outside the jurisdictional authority of the governmental unit by which the police officer is authorized to act when the traffic infraction is committed in the police officer's presence.

"(3) A police officer:

"(a) Shall not arrest a person for a traffic infraction.

"(b) May stop and detain a person for a traffic infraction for the purposes of investigation reasonably related to the traffic infraction, identification and issuance of citation."

He asserts that ORS 810.410(2) permits officers who act outside their own jurisdictions to make traffic stops only when infractions have been committed in their presence. Reasoning that, by requiring the infraction to be committed in the officer's "presence," the legislature contemplated that an officer would respond immediately, he argues that Anderson and Gray violated the intent of the statute when they waited fifteen minutes after witnessing the speeding infraction to stop defendant.

We can discern no basis for that conclusion. ORS 810.410(2) does not contain a limitation on the time within which an officer must cite an offending driver. Defendant committed a traffic infraction in the officers' presence. Therefore, they were authorized to "stop and detain" him under ORS 810.410.

■ Defendant also argues that the stop violated ORS 810.410(3)(b), because the officers did not stop him "for the purposes of investigation reasonably related to the traffic infraction," but rather for purposes of gathering information

on drug dealing activities. However, the trial court found that the officer asked defendant for his driver's license. Anderson also testified that he told defendant that he was driving too fast. Although Anderson may have had additional purposes for the stop, his actions were consistent with the acts of an officer investigating a traffic infraction. The statutory requirements for a traffic stop were satisfied.

■      Defendant's second argument is that, because the officers had only one real motive for stopping the car—to investigate drug activity—the stop for the traffic violation was a pretext. He urges that, in testing the validity of pretext stops under the Fourth Amendment and Article I, section 9, we should adopt a standard of objective reasonableness. That is, we should ask whether a reasonable officer would have made the stop in the absence of an "improper" purpose. Because a reasonable officer in Anderson and Gray's position would not have stopped defendant in the absence of a desire to gather drug intelligence, he argues, the stop violated Article I, section 9, and the Fourth Amendment.

The United States Supreme Court has not decided the validity of so-called "pretext stops" under the Fourth Amendment, and Oregon never before has considered the issue exclusively under Article I, section 9.[1] However, in considering defendant's argument under the Fourth Amendment, the Oregon Supreme Court has rejected it as unworkable and undesirable.

In *State v. Tucker, supra* n 1, officers saw two

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

In *State v. Tucker,* 286 Or 485, 490, 595 P2d 1364 (1979), and *State v. Carter/Dawson,* 287 Or 479, 485, 600 P2d 873 (1979), the Supreme Court purported to consider pretext stops under both Article I, section 9, and the Fourth Amendment. However, in *State v. Flores,* 68 Or App 617, 625, 685 P2d 999, *rev den* 298 Or 151 (1984), we concluded that the Supreme Court would treat cases decided after *State v. Florance,* 270 Or 169, 527 P2d 1202 (1974), which adopted the federal rule regarding searches incident to arrest, and before *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982), which required independent analysis of the same question under the Oregon Constitution, as interpreting the Fourth Amendment only. Because *Tucker* and *Carter/Dawson* fall into that category, they are not dispositive of the issue of pretext stops under the Oregon Constitution.

bicyclists, one riding with an almost flat tire and carrying a laundry basket covered by a blanket. The bicyclists noticed the patrol car and changed direction; the officers stopped them after they ran a stop sign. Although the officers gave as their reason for the stop that there was something "out of the ordinary" about the bicyclists' appearance and behavior, the trial court found that their purpose had been to cite or arrest them for the traffic violation. 286 Or at 488.

The Supreme Court held that a traffic stop is not invalid under the Fourth Amendment "simply because, in addition to probable cause to arrest for a specific offense (or to stop for purposes of issuing a citation), the officer also has a suspicion which contributes to the decision to make the stop." 286 Or at 493. It explained:

> "[We do not] believe that determining the validity of an otherwise authorized stop on the basis of the officer's purpose, or primary purpose, in making it would be either practical or desirable.
>
> "* * * * *
>
> "[T]his approach would be unworkable. Any time evidence of criminal activity came to light during a routine traffic stop, trial courts would be called upon to decide whether the officer had noticed anything about the violator or the vehicle beyond the fact of the violation itself and, if so, whether he would have made the stop upon the hypothetical supposition that he had noticed nothing." 286 Or at 493, 495.

In *State v. Carter/Dawson, supra* n 1, the court went further. That case presented an issue identical to the one before us: "whether a policeman who wants to get a closer look at a car or its occupants may follow it and, if the driver commits a traffic violation while the officer is following, may then stop it." 287 Or at 485. The court first noted that police officers have the right to keep persons of whom they are suspicious under surveillance in public places, regardless of their reasons. It then stated:

> "[The officer] thus had a right to be where he was when he observed the speeding violation. Because [his] continued observation of the car in which defendants were riding was proper under the circumstances, there are no grounds for holding that when he saw the car's operator commit a traffic violation he could do nothing about it." 287 Or at 485.

*See also State v. Zimmerlee,* 45 Or App 107, 607 P2d 782, *rev den* 289 Or 71 (1980).

That reasoning is as sound under Article I, section 9, as it is under the Fourth Amendment. Anderson and Gray may have had more than one reason for wanting to stop defendant and his passenger. Although the primary reasons may have been to gather information and to identify them, they also wanted to cite them for speeding. Anderson explained:

"For a traffic stop. Well, a combination of—as I said again, they were going too fast * * * and our observations of the locations that they had stopped at and intelligence gathering, to identify them."

Whether the officers would have stopped defendant for speeding (or for a more serious infraction, had one occurred) without their desire to know more about the car's occupants is irrelevant. They were doing proper police work in a place that they had a right to be and were present when defendant committed a traffic infraction. The fact that they were already suspicious of defendant could not prevent them from issuing him a citation for the infraction.

■■ Contrary to defendant's contention, section 9 does not require a different result. Its purpose is to protect citizens from *unreasonable* searches and seizures.[2] *State v. Tanner,* 304 Or 312, 315, 745 P2d 757 (1987). Whether a protected property or privacy interest has been violated depends on "whether the practice, *if engaged in wholly at the discretion of the government,* will significantly impair 'the people's' freedom from scrutiny." *State v. Campbell,* 306 Or 157, 171, 759 P2d 1040 (1988). (Emphasis supplied.) As the Supreme Court noted in *State v. Tucker, supra* n 1, "[a]n officer who stops a vehicle when he sees its operator commit a traffic violation does not interfere with the operator's freedom of movement based only on the officer's 'standardless and unconstrained discretion.' " 286 Or at 492. Moreover, once the officer has made the stop, unless circumstances arise that give cause to inquire further, his activities are limited to ones related to the traffic stop. *See State v. Carter/Dawson, supra* n 1, 287 Or at 486. Permitting

---

[2] A traffic stop is a seizure under Article I, section 9. *See* ORS 131.605(5); *Nelson v. Lane County,* 304 Or 97, 101, 743 P2d 692 (1987); *State v. Tourtillott,* 289 Or 845, 618 P2d 423, *cert den* 451 US 972 (1980).

officers to do no more than stop an individual who has committed a traffic infraction and make reasonable inquiries related to that infraction does not constitute an unreasonable seizure under Article I, section 9.

Once the stop occurred, Anderson asked to see defendant's driver's license and told him that he had been speeding. At that point, Gray told Anderson that defendant's passenger was smoking marijuana. This is not a case in which an officer used a stop as "an excuse to begin questioning, searching or investigating [matter] that is unrelated to the traffic reason for the stop." *See State v. Carter/Dawson,* 34 Or App 21, 32, 578 P2d 790 (1978), *mod and rem'd* 287 Or 479, 600 P2d 873 (1979). Until circumstances arose to give him probable cause to believe that the crime of possession of a controlled substance was being committed, Anderson's conduct was in fact limited to activities related to the traffic infraction.

Affirmed.

**WARREN, J.,** dissenting.

In *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982), the Supreme Court rejected the rule of uniformity with Fourth Amendment analysis that had been adopted in *State v. Florance,* 270 Or 169, 527 P2d 1202 (1974), and stated that Oregon courts are free to impose on searches and seizures under our own constitution higher standards than are required by the federal constitution. *State v. Caraher,* 293 Or at 750. The court later pointed out that Article I, section 9, differs from the Fourth Amendment because its historical focus emphasizes the people's freedom from scrutiny, rather than police deterrence. *State v. Tanner,* 304 Or 312, 745 P2d 757 (1987).

The majority relies on *State v. Tucker,* 286 Or 485, 595 P2d 1364 (1979), which analyzed pretext stops while the rule of uniformity was in effect. In *Tucker,* the court rejected a standard of "objective reasonableness" for pretext stops,[1] stating that such an approach is unworkable and is not sup-

---

[1] The court rejected a standard that Judge Tanzer offered in his dissent in *State v. Carter/Dawson,* 34 Or App 21, 28, 578 P2d 790 (1978), that stated that evidence of other crimes discovered during a traffic stop should be excluded during a traffic stop if either "(1) the officer would have made the stop for that violation even if he did not suspect possible criminal activity and want to investigate further; or (2) the officer had grounds for reasonable suspicion of criminal activity which would justify a stop without regard to the traffic offense." *State v. Tucker, supra,* 286 Or at 494.

ported by Fourth Amendment authority. 286 Or at 493-95. In recent years a number of federal circuit courts have shown the practical utility of the "objective reasonableness" standard for pretext stops and arrests.[2] Although *State v. Tucker, supra,* and *State v. Carter/Dawson, supra* n 1, are controlling on our interpretation of the Fourth Amendment, we may still consider the reasoning of other federal cases in analyzing this issue under Article I, section 9. In doing so, we discover that most federal circuit courts consider pretext stops to be illegal and that they have developed criteria for evaluating a stop to determine whether it is pretextual.

The Tenth Circuit has provided a definition of a pretext stop:

"A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop. The classic example * * * occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity." *U.S. v. Guzman, supra* n 2, 864 F2d at 1515.

In a discussion of a related issue, pretext arrest, the Seventh Circuit has explained that the federal circuits have moved in recent years from a subjective Fourth Amendment inquiry to an objective assessment of the reasonableness of police activity, although "the adoption of an objective standard substantially diminishes the chances of discovering pretextual arrests." *U.S. v. Trigg, supra* n 2, 878 F2d at 1040. The Eighth and Ninth circuits continue to rely on the subjective purpose of officers in order to determine whether a stop is unconstitutional. *U.S. v. Portwood,* 857 F2d 1221, 1223 (8th Cir 1988); *U.S. v. Baker,* 850 F2d 1365, 1368 (9th Cir 1988).[3]

Some federal courts have adopted a rule developed in the Eleventh Circuit, and similar to that rejected in *State v.*

[2] *See, e.g., U.S. v. Trigg,* 878 F2d 1037, 1040 (7th Cir 1989); *U.S. v. Guzman,* 864 F2d 1512, 1515 (10th Cir 1988); *U.S. v. Hawkins,* 811 F2d 210 (3rd Cir 1987); *United States v. Smith,* 799 F2d 704, 708 (11th Cir 1986).

[3] The court in *U.S. v. Baker, supra,* noted, however, that traffic violations are criminal conduct sufficient for an investigative stop. A traffic infraction is not a crime in Oregon. ORS 161.515(1); ORS 153.615.

*Tucker, supra,* that relies on objective circumstances to determine an illegal motive: "[W]hether a reasonable officer *would* have made the seizure in the absence of an illegal motivation." (Emphasis in original.) Under that standard, even if a valid basis for a traffic stop can be found, if objective circumstances show that reasonable officers would not have made the stop in the absence of a desire to investigate the more serious crime for which they do not have a reasonable suspicion, then the stop violates the Fourth Amendment. 799 F2d at 710.

The Eleventh Circuit later refined this "objective reasonableness" test, basing its decision on whether the defendant violated a statute "for which the patrol regularly made stops, with or without suspicion of drug activity." *U.S. v. Bates,* 840 F2d 858 (11th Cir 1988). The Tenth Circuit stated that "the proper basis of concern is not with *why* the officer deviated from the usual practice in this case but simply that he *did* deviate." (Emphasis in original.) *U.S. v. Guzman, supra* n 2, 864 F2d at 1517, *quoting* 1 LaFave, *Search and Seizure* § 1.1(e), 94 (1987). Courts in the Third Circuit have also relied on *United States v. Smith, supra* n 2. *See, e.g., U.S. v. Hawkins, supra* n 2; *U.S. v. Padron,* 657 F Supp 840, 846 (D Del 1987).

Only the Fifth and Seventh Circuits follow a rule similar to that in *Tucker* and adopted by the majority, which suggests that no illegal pretext exists as long as officers have taken no action except what the law objectively allows. *U.S. v. Trigg, supra* n 2; *U.S. v. Zukas,* 843 F2d 179, 182 (5th Cir 1988) (pretext stop); *U.S. v. Causey,* 834 F2d 1179, 1185 (5th Cir 1987) (pretext arrest). I return to Article I, section 9, with the federal law in mind.

The majority has moved far from the early concerns expressed by the Supreme Court when analyzing a warrantless search incident to arrest under Article I, section 9:

"[T]he trial judge must determine whether the officers went to the place to make a lawful arrest, and in making it looked for evidence lawfully subject to seizure, or whether the officers used a pretended arrest for one offense as a Trojan horse in order to obtain entry, only to prosecute for some greater crime after finding sufficient evidence to justify their belief in the defendant's probable guilt of the greater crime. The first kind of search is incidental to an arrest and is lawful; the second is a

fishing expedition and is as odious as the general warrant of antiquity." *State v. Chinn,* 231 Or 259, 373 P2d 392 (1962).

*Chinn,* not *State v. Tucker, supra,* is the Supreme Court's clearest statement under the Oregon Constitution. Section 9 protects "the people" from fishing expeditions. In order to avoid the imposition of unreasonable burdens on those who wish to maintain a "sense of security," we must adopt a standard that prevents the use of pretext stops as a Trojan horse to gain evidence of other crimes.

I agree that, under normal circumstances, if a driver commits a speeding violation while an officer is legally following the vehicle for surveillance purposes, the officer may properly stop the vehicle in order to issue a ticket and, in so doing, may incidentally further the investigation. However, in order to avoid the type of fishing expedition against which the court cautioned in *Chinn,* some restrictions are necessary. Since the time that the Supreme Court rejected the standard of "objective reasonableness" under the Fourth Amendment in *State v. Tucker, supra,* stating that the standard lacked authority and practicality, many federal courts have proven its usefulness. Our own history of constitutional protection from unreasonable scrutiny under Article I, section 9, and *State v. Chinn, supra,* provides authority for such a standard.

The Eleventh Circuit test of whether a reasonable officer *would* have made the seizure in the absence of an illegal motivation is appropriately flexible for police surveillance, because it allows any traffic stop that is conducted in accordance with standard police practices. Once a deviation from such practices is noted, then the proper question is whether objective circumstances create an illegal pretext for the stop.

Stopping defendant shortly after the officers saw him speeding might have constituted normal police practice. Seeing a traffic infraction, following the offender a number of miles to an apartment, watching him stop the vehicle and enter and leave an apartment, continuing to follow him and then making the traffic stop is not the manner in which a reasonable officer would have conducted a stop for speeding in the absence of an impermissible motivation. The officers admit that their purpose in stopping the vehicle was "intelligence gathering" about drug activity. Not having a reasonable suspicion basis to stop defendant to investigate drug

activity, they waited until after he visited an apartment where drugs may have been bought or sold and used the traffic stop as an unconstitutional pretext.

The majority is wrong even under the Supreme Court's interpretation of the Fourth Amendment. Comparing the facts in *State v. Tucker, supra,* to those of a Ninth Circuit pretext case, *Taglavore v. United States,* 291 F2d 262 (9th Cir 1961), the Supreme Court noted that, in *Tucker,* the police made an on-the-spot stop of the traffic violator immediately after they observed the offense, whereas, in *Taglavore,* the police deliberately delayed serving a warrant for a minor traffic offense until they believed that the defendant was carrying drugs. *State v. Tucker, supra,* 286 Or at 296 n 9. In *State v. Carter/Dawson, supra* n 1, 287 Or at 479, the court noted that the police had followed the vehicle for a mile after observing the speeding violation and that the officer had testified that there was no good place to pull over within that mile. The court concluded that, under "normal circumstances," the police may follow a vehicle, see a traffic violation and conduct a stop. 287 Or at 485. In this case the police did not stop defendant immmediately or at their first convenient opportunity. There was not a "normal" traffic stop, and it violated Article I, section 9.