# STATE OF OREGON,
*Respondent,*

*v.*

# JOSEPH ELWOOD EHLY,
*Appellant.*

(89-CR-0958-TM; CA A63346)

819 P2d 1386

Peter Gartlan, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender, Salem.

Jas. Adams, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Joseph, Chief Judge,* and Deits, Judge.

DEITS, J.

Joseph, C. J., dissenting.

---

* Joseph, C. J., *vice* Newman, J., deceased.

## DEITS, J.

Defendant appeals convictions for being an ex-felon in possession of a firearm, ORS 166.270(1), and possession of a controlled substance. ORS 475.992(4)(b). He contends that the trial court erred in denying his motion to suppress evidence that police officers found in his bag after they responded to a call for assistance from a motel manager. We affirm.

Evert, the manager of a motel in Bend, became concerned when defendant did not check out of his motel room by check-out time. Evert was aware that defendant had damaged a room at another motel a week earlier and that someone in defendant's room had cursed through the door at a housekeeper. Evert telephoned defendant, who responded abusively. Evert then asked his wife to call the police, and he went to defendant's room. When he entered the room he found defendant there with two women, who acted as if they were hiding something. One immediately went into the bathroom and flushed the toilet, and the other woman left. The bedspread had been slashed, the furniture was askew and food had been splashed on the floors, drapes and windows.

Evert observed that defendant was "semi-coherent" and of a "belligerent and nervous" demeanor. He believed that he was under the influence of drugs. Evert told him that he owed $15 for the phone bill and that he needed to return the room key. One of the women went to the car, got $10 and gave it to Evert. Defendant said that he did not have the key but that he would leave. Evert told him that he wanted to keep his bags as security for the remainder of the phone bill and the key.

Police officers Emerson and Cleaves soon arrived. As they entered the parking lot of the motel, they saw a man whom they recognized leaving the motel. They were aware that he had been seen with defendant the day before and that he was "possibly armed with an automatic handgun." The officers entered the motel room while Evert and defendant were discussing the key. They observed that defendant was "very nervous, very anxious" and was apparently under the influence of methamphetamine. When they told him to leave, he picked up his bags and walked toward the door. Evert again

said that he wanted the room key. Emerson told defendant to give the key to Evert. Defendant replied that the key might be in the bags but that he did not know exactly where it was. He also said that the bags belonged to a friend. When he did not produce the key, Cleaves said, "Well, why don't we walk over here to the bed." Defendant walked over and set the bags on the bed. Cleaves then said, "Well, why don't you try and find the key for us?" Defendant agreed to do that.

Neither officer blocked the door, and both stood back while defendant opened and began searching with one hand through the smaller bag, a blue gym bag approximately 18 inches wide and 24 inches long. Defendant put both hands into the bag and rummaged through it. As he did so, the officers became concerned that there might be a gun in the bag and that the situation was getting out of control. Defendant's hands were completely concealed as he felt around in the bag. Emerson suggested that defendant empty the bag. When defendant continued rummaging through it with both hands, Cleaves put her hand on her gun and told him to back up. She then grabbed the bag and dumped it out. A loaded .32 automatic handgun fell out, along with clothing, papers and pictures, many with defendant's name on them. Emerson then asked defendant to dump the second bag. Defendant said that it belonged to someone else, but he emptied it anyway. When the officers were replacing the items into the bags, they discovered a small bag of methamphetamine.

■ Defendant argues that the evidence discovered in his bags must be suppressed, because the actions of the officers cannot be justified on the basis of concerns for officer safety. He further contends that, even if the officers' actions were justified, the evidence must be suppressed because he had been illegally detained.

In *State v. Bates,* 304 Or 519, 524, 747 P2d 991 (1987), the Supreme Court held

"that Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, *during the course of a lawful encounter with a citizen,* the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." (Emphasis supplied.)

We conclude that the officers' actions here were justified because of concern for their safety. They had a reasonable suspicion, based on specific and articulable facts, that defendant posed an immediate threat to them and to others. Evert had called the police, because he believed that motel property was being destroyed and because he feared for his personal safety. When the officers arrived, they saw a man leaving the motel whom they knew to be an acquaintance of defendant and whom they knew might be carrying a weapon. The officers reasonably assumed that defendant might be armed. They observed defendant to be extremely nervous and, perhaps, under the influence of drugs. He had been verbally abusive, and Evert was having trouble getting him to check out. The motel room had been trashed. The officers' fears that defendant had a gun in the bag and might use it were further aroused when he began rummaging through the bag with both hands concealed.

■    Intuition alone is not enough to amount to reasonable suspicion. *State v. Houghton,* 91 Or App 71, 75, 754 P2d 13 (1988). The officers, however, did not rely solely on intuition. On the basis of the facts stated, they perceived immediate danger to themselves, to the motel manager and to the housekeepers who were nearby. As said in *State v. Bates, supra,* 304 Or at 524:

> "[I]t is not our function to uncharitably second-guess [*sic*] an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."

The officers' suspicions that defendant posed an immediate threat of serious physical injury "were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."

■    Defendant argues that, even if the officer's actions could be justified, the evidence must be suppressed because the discovery did not occur during the course of a lawful

encounter. He argues that the stop violated ORS 131.615[1] and that the officers seized him in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment. The subsequent search of his belongings, therefore, was unlawful.

The test for whether a person has been seized within the meaning of Article I, section 9, was recently articulated in *State v. Holmes,* 311 Or 400, 409, 813 P2d 28 (1991):

> "[A] 'seizure' of a person occurs under Article I, section 9, of the Oregon constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

In *State v. Gerrish,* 311 Or 506, 815 P2d 1244 (1991), the Supreme Court further explained the appropriate inquiry in determining whether a seizure of a person by the police has occurred:

> "(1) [T]he determination is a 'fact-specific inquiry into the totality of the circumstances of the particular case'; (2) the pivotal factor in deciding whether any interference with the citizen's liberty is 'significant' is 'whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens." 311 Or at 511.

Considering the totality of the circumstances here, we do not think that the interference with defendant's liberty was significant. The motel manager had told defendant that he could not take his bags unless he provided the key. The officers testified that they did not tell defendant that he could not leave but that they did tell him that the manager wanted the key. Both officers testified that, if defendant had either found the key or said that he did not have it, they would have

---

[1] ORS 131.615(1) provides:

"A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonably inquiry."

A "stop" for purposes of ORS 131.615 is "a temporary restraint of a person's liberty by a peace officer lawfully present in any place." ORS 131.605(5).

let him leave. They did not block him from leaving the room. When defendant responded that the key might be in his bags, the officers asked him to look for it. The trial court found that defendant voluntarily began looking in his bag for the key and that he was given the opportunity to empty the second bag. As he searched the first bag, the officers stood back until they became concerned for their safety. During the encounter, the officers never indicated to defendant that they thought that he had committed a crime, nor did they threaten him in any way. They were simply attempting to assist the manager in getting the motel key back.[2] We conclude that the discovery of the evidence occurred during a lawful encounter.

As explained in *State v. Gerrish, supra,* 311 Or at 517, the analysis of whether there is a seizure of the person under the Fourth Amendment is similar to that under Article I, section 9:

> "In our view, the current test for the seizure of a person under the Fourth Amendment is one that takes into account all the facts and circumstances of the encounter, including — but not limited to — whether a reasonable person in the defendant's position would believe that he was free to leave. The latter factor is not determinative. *State v. Holmes, supra,* 311 Or at 413."

Considering all the circumstances, we conclude that the officers did not violate defendant's rights under the state or federal constitution. They did not seize defendant's person until after they discovered the gun when they stopped him, as authorized by ORS 131.615. The trial court properly denied the motion to suppress.

Affirmed.

**JOSEPH, C. J.,** dissenting.

The majority's opinion is wonderfully, but dangerously, imaginative. It justifies police conduct on the basis of the officers having seen, outside the motel, someone (not

---

[2] Defendant also argues, relying on *State v. Bridewell,* 306 Or 231, 759 P2d 1054 (1988), that, absent a showing of specific authority for the police actions, evidence obtained by police during a "community caretaking" function may not be introduced against that person in a subsequent criminal prosecution. However, defendant failed to raise this argument below, and we do not believe that it is error apparent on the face of the record under *State v. Brown,* 310 Or 347, 800 P2d 259 (1990).

defendant) whom they supposedly had reason to fear and their having a justified concern for their safety arising out of a supposedly dangerous situation that was mostly of their own manufacture. It concludes, "[c]onsidering the totality of the circumstances here," 109 Or App at 461, that what happened in the motel room was not a significant interference with defendant's liberty. I hope, but seriously wonder whether, we have not moved so far down the path of usually supporting police lawlessness that this court will have a majority in every case ready to approve anything done by the police so long as they say that their conduct was motivated by fear. I do not want to travel that route, because it threatens the liberty interests of good people as well as of bad people like defendant in this case.

I dissent.